UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DEAN LAWRENCE BROOKS,

Petitioner,

v.

SHERYL RAMSTAD HVASS,
Commissioner of Corrections,

Respondent.

CIVIL NO. 01-2178 (JMR/JMM)

REPORT AND RECOMMENDATION

THIS MATTER is before the undersigned United States Magistrate Judge on Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254. (Docket No. 1.) In 1998, Petitioner pleaded guilty to second degree murder charges, but he now claims that his conviction should be vacated because (1) he was denied his constitutional right to self-representation, (2) his guilty plea was not entered knowingly and voluntarily, and (3) he received ineffective assistance of counsel. Respondent has filed a response, (Docket Nos. 9-12), arguing that all of Petitioner's claims should be denied on the merits.

The matter has been referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, the Court concludes that Petitioner's habeas corpus petition should be DISMISSED WITH PREJUDICE.

## I. BACKGROUND

On December 19, 1997, Petitioner invited his former girlfriend to come over and visit him at his mother's house. When the woman got there, Petitioner shot her in the head and killed her. He put her body in the trunk of a car and drove to another city, where he left the car parked in the street with the body still in the trunk. The police found the car

MAY 2 2 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

and the victim's body several weeks later.

During the weeks and months after the murder, Petitioner made several self-incriminating statements to various people. Although Petitioner tried to hide some of the evidence linking him to the murder, the police were able to build a strong case against him. Several months after the murder, a grand jury indicted Petitioner, and he was charged with first degree murder.

At the direction of the trial court, Petitioner was given a psychological evaluation to determine whether he was competent to stand trial. During the summer and fall of 1998, Petitioner was interviewed and examined by several mental health experts, who offered varying opinions about his mental condition and competency. By late October 1998, the trial court was satisfied that Petitioner was competent to go to trial, and a jury panel was assembled. However, on October 28, 1998, Petitioner refused to dress and come to the courtroom for the beginning of his trial. When he did the same thing again the next day, the trial court judge ordered further psychological examinations.

On November 3, 1998, there was another lengthy hearing on the competency issue. The following morning, the trial court judge filed a written order which decreed (again) that Petitioner was competent to stand trial, and that his trial would begin at 9:00 a.m. that day. However, when the judge entered the courtroom and announced that jury selection would begin, Petitioner immediately declared that he wanted to "fire" his lawyers and retain new counsel. (Respondent's Exhibit L, Attachment C, p. 2.[1]) When the

---

[1] Respondent's return includes various exhibits labeled as Exhibits A through Z. Those exhibits will be referred to herein as "Resp. Exh. __." (Exhibits A through G are at Docket No. 9 of our court file, and Exhibits H through Z are at Docket No. 12.) Several of Respondent's Exhibits include various attachments, which also are identified by letters of the alphabet. Those attachments are referred to herein as "Att. __."

judge asked him why he wanted to do that, Petitioner offered only vague answers, such as "stuff happens" and "I feel they aren't doing the right job." (Id., pp. 2-3.) He later said (without explanation) that his attorneys "were with the prosecutor." (Id., p. 9.) When the judge asked Petitioner what he would like to do if his attorneys were discharged, Petitioner indicated that he would like to "get new lawyers." (Id., p. 5.)

The trial judge advised Petitioner that he could fire his lawyers, but he would not be granted a lengthy continuance to search for substitute counsel, because he had not shown that he had any genuine need for a new lawyer. The judge noted that there were nearly 100 potential jurors "waiting to do their civic duty," and that it was "a little late" for Petitioner to be asking for a continuance so he could look for a new attorney. (Id., p. 8.) It is readily apparent that the judge was concerned that Petitioner was just looking for a way to delay his murder trial. Although the judge ultimately granted Petitioner's request to discharge his lawyers, he told Petitioner that he still would have to be prepared to start his trial by the following morning. (Id., p. 12.)

Petitioner was back before the court again at 1:30 that afternoon. The judge noted for the record that a criminal defense lawyer named Michael Colich had agreed to meet with Petitioner. The case was adjourned until 9:00 a.m. the next day to give Petitioner a chance to decide whether he wanted to retain Colich, or perhaps some other attorney, to represent him. (Resp. Exh. L, Att. N., pp. 1-10.)

Attorney Colich did meet with Petitioner later that day, but Petitioner quickly concluded that he did not want Colich to represent him. The following morning, November 5, 1998, Colich reported to the trial court that Petitioner "was not going to be satisfied or happy with my representation, and I want to honor that decision." (Resp. Exh. L, Att. O, p. 3.) The judge accepted that report and Colich was excused from the case.

The judge then told Petitioner again that he would be allowed to represent himself at trial if that was what he wanted to do. Petitioner was also told that if he decided to represent himself, a "standby lawyer" would be appointed to assist him, if he decided that he wanted some legal assistance during the course of the trial. (Id., p. 5.) The judge then gave Petitioner one more option, namely that the court would select a lawyer to represent Petitioner, at Petitioner's expense. During the next several minutes thereafter, Petitioner vacillated over the course he wanted to take. First he said, "I want to represent myself. I just want to plead guilty to all three charges." (Id., p. 6.) A moment later he said, "I'm pleading innocent," and added "[y]eah, I was crazy[;] I was just going through problems." (Id.) A few seconds after that he indicated that he was interested in a plea bargain. (Id., p. 7.) At the end of that hearing, the judge said that he would appoint an attorney, and Petitioner could decide later whether he wanted that attorney to actually represent him, or to merely act as standby counsel while he represented himself. (Id., pp. 8-9.)

The next day, Friday, November 6, 1998, the trial court entered a written order, which noted that Petitioner's original defense attorneys "were well prepared and ready to proceed to trial," and that Petitioner had failed to "articulate a valid [or] substantial reason for discharging his counsel." (Resp. Exh. L, Att. D, p. 1.) The order acknowledged, however, that Petitioner had "an absolute right to discharge his counsel." (Id.) The order further said that "Attorney Charles Gegen is hereby appointed as counsel for [Petitioner] in the presentation of his defense," that Petitioner would be responsible for paying Gegen's fee, and that the trial would resume at 9:00 a.m. the following Thursday, November 12, 1998. (Id., p. 2.)

Attorney Gegen was an acquaintance of the trial court judge, who had been active in the legal profession for nearly 40 years. He had been a county judge (later a state district court judge) for approximately 15 years, and he had been in private practice with his attorney-wife since 1986. Attorney Gegen's legal experience included criminal defense work, and he had served as a part-time public defender for about a year and a half. He had defended at least two prior clients facing murder charges, and he had obtained an acquittal for one of those clients. ("Finding and Order" from Petitioner's post-conviction proceedings, dated June 23, 2000; Resp. Exh. R, p. 15, ¶ 45.)

Attorney Gegen visited Petitioner in jail for 18 minutes on November 6, 1998. Petitioner apparently was willing to talk to Gegen, (which had not been the case with Attorney Colich), and he told Gegen repeatedly that he did not want to go to trial. Instead, he wanted a plea agreement that would allow him to avoid the potential life sentence of a first degree murder conviction. Over the course of the next several days, Gegen and his wife reviewed Petitioner's file, and Gegen met with Petitioner four more times. The length of their visits ranged from a few minutes to approximately an hour. During those visits, Petitioner consistently informed Gegen that he was looking for a plea agreement. (Id., p. 17, ¶s 52-53.)

Gegen ultimately negotiated a deal with the county prosecutor whereby Petitioner would plead guilty to a single count of second degree murder and would be sentenced to 36 years in state prison – an upward departure from the state sentencing guidelines range for a second degree murder conviction. With credit for good prison conduct, Petitioner could be released from prison after serving 24 years. The agreement also required Petitioner to pay certain expenses incurred in connection with his criminal prosecution. The first degree murder charges against Petitioner were to be dismissed.

On November 12, 1998, the day when Petitioner's trial had been rescheduled to begin, Attorney Gegen and Petitioner appeared in court together and confirmed that Petitioner was ready to plead guilty to second degree murder pursuant to the agreement that Gegen had negotiated. Petitioner had already discussed the plea arrangement with Gegen, and he had already signed a lengthy written agreement that explained the rights he was waiving by pleading guilty.[2] Even though Petitioner had signed that document, there still was a comprehensive plea colloquy in the courtroom after Petitioner initially indicated that he was ready to plead guilty.

At the outset of that colloquy, Petitioner acknowledged that he had met with Gegen on about five separate occasions, and that he had "gotten along pretty well" with Gegen. (Sentencing transcript, Resp. Exh. B, p. 5.) Gegen then asked Petitioner directly: "[a]nd you accept me fully as your attorney in this matter?" (Id.) Petitioner responded: "yeah." (Id.) Petitioner did not say or do anything else during the course of that final hearing that could have suggested he was dissatisfied with Attorney Gegen, that he wanted to discharge Attorney Gegen, or that he wanted to represent himself.

Attorney Gegen asked Petitioner a series of questions to establish that Petitioner knew about the rights he was waiving by pleading guilty, including the right to a jury trial, the right to call and subpoena defense witnesses, the right to refuse to testify, and the right to be presumed innocent and to be convicted only upon proof beyond a reasonable doubt. (Id. pp. 14-15.) Petitioner acknowledged that Attorney Gegen had talked to him about the possibility of a mental illness defense, and the possibility of arguing

---

[2] The Court has not found the actual plea petition in Respondent's return, but there are frequent references to it throughout the file. (See e.g., Resp. Exh. E, pp. 5-6; Resp. Exh. M, [Transcript of post-conviction motion evidentiary hearing on February 4, 2000], pp. 16-24.)

that he had acted in self-defense. (Id., pp. 8-11.) He further acknowledged that he had voluntarily rejected those possible defenses, because he wanted to accept the plea agreement that would limit his sentence to 36 years.

Petitioner also answered a series of questions which demonstrated that he was pleading guilty of his own volition, and that he had not been coerced or pressured into accepting the plea agreement. He answered other questions which indicated that even though he was taking some medications, he fully understood what he was doing by pleading guilty. (Id., pp. 21-23.) Finally, Petitioner fully and freely admitted that he had committed the murder for which he was being prosecuted; that he had shot the victim in the head on purpose, knowing that he was killing her and that killing her was wrong. (Id., p. 24.) At the conclusion of the hearing, the trial court judge accepted Petitioner's guilty plea and imposed the 36-year sentence contemplated by the plea agreement.

In August 1999, Petitioner filed a motion in the trial court seeking post-conviction relief under Minn.Stat. §§ 590.01 et seq. (Resp. Exh. H.) In his post-conviction motion, Petitioner argued, inter alia, that his guilty plea should be vacated and his conviction should be overturned because (1) the trial court had not specifically determined whether he was competent to plead guilty, (2) his guilty plea was not entered knowingly and voluntarily, and (3) Attorney Gegen did not provide effective legal representation. The trial court held an evidentiary hearing, which took four days to complete. The transcript of that hearing, (Resp. Exh. M), is more than 750 pages long. The witnesses at the hearing included Attorney Gegen, Attorney Colich, and several doctors. On June 23, 2000, the trial court entered a 45-page memorandum and order, which denied Petitioner's post-conviction motion. (Resp. Exh. R.)

Petitioner then appealed to the Minnesota Court of Appeals. He raised several claims in his appeal, including the three claims raised in his current habeas corpus petition -- i.e., (1) that he was deprived of his constitutional right to represent himself, (2) that his guilty plea was not entered knowingly and voluntarily, and (3) that he received ineffective legal assistance from Attorney Gegen. The Court of Appeals rejected all of Petitioner's claims, (by a two-to-one majority), and affirmed his conviction and sentence. Brooks v. State, No. C6-00-1481 (Minn.App. 2001) 2001 WL 436157 (unpublished opinion).[3] The Minnesota Supreme Court denied Petitioner's subsequent petition for further review on July 24, 2001.

On November 30, 2001, Petitioner filed his current application for federal habeas corpus relief. As previously noted, his petition presents three specific issues, which he describes as follows:

> "1. Whether petitioner was denied his constitutional right to self-representation when the trial court chose private counsel for Petitioner after Petitioner was found competent to waive counsel and expressed a desire to proceed without counsel.
>
> 2. Whether Petitioner's guilty plea [was] knowing, intelligent, voluntary or accurate.
>
> 3. Whether Petitioner was denied effective assistance of counsel where, amongst other deficiencies, the trial court's selected counsel had minimal contact with petitioner, did not discuss the sentencing guidelines with petitioner whose guilty plea resulted in an upward departure from the sentencing guidelines, failed to investigate the mental illness defense and failed to discuss the facts of the case or defenses with Petitioner."

---

[3] One judge on the Court of Appeals panel concluded that Petitioner's guilty plea should be vacated because the trial court "had no authority to choose who [Petitioner's] 'private' attorney should be." Brooks, 2001 WL 436157 at *11 (Schumacher, J., dissenting).

(Petition, [Docket No. 1], "Attachment 1," p. 2.)

For the reasons discussed below, the Court concludes that Petitioner is not entitled to habeas corpus relief on any of these three issues.[4]

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets out the standards that govern this Court's review of habeas corpus petitions filed by state prisoners. The relevant portion of the AEDPA, 28 U.S.C. § 2254(d), provides that:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court discussed the meaning of this statute, and how it should be applied by the federal district

---

[4] A fourth issue listed in the petition is "[w]hether cumulative errors and irregularities in the proceedings undermine the constitutional reliability of Petitioner's conviction and sentence." (Petition, "Attachment 1," p. 2.) This "cumulative errors" issue is not specifically addressed here, because our Court of Appeals has expressly held that "[n]either cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief." Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir.), cert. denied, 519 U.S. 968 (1996). Furthermore, the Court finds, for the reasons discussed below, that the other alleged "errors and irregularities" listed in the Petition do not raise any meaningful doubts about the constitutionality of Petitioner's conviction. Because none of the specific claims listed in the Petition warrant habeas corpus relief, they cannot do so cumulatively. See id. ("[e]rrors that are not unconstitutional individually cannot be added together to create a constitutional violation").

courts. The Supreme Court recognized that

> "a state-court decision can be 'contrary to' this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."

Id. at 405.

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

Id. at 413.

The Court also explained that

> "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.... [¶] [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

Id. at 409, 411.

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In other words, habeas relief can be granted if the conviction is based on findings of fact that could not reasonably be derived from the evidentiary record. When reviewing a state court decision, however, "a federal court... presumes that the state court's

factual determinations are correct," and that presumption "may be rebutted only by clear and convincing evidence." Lee v. Gammon, 222 F.3d 441, 442 (8th Cir. 2000).

## III. DISCUSSION

### A. Right To Self-Representation

It is well-settled, of course, that a defendant in a criminal case has a constitutional right to dismiss his attorney and represent himself at trial. Faretta v. California, 422 U.S. 806 (1975). A defendant also has a right to seek new legal counsel if he is dissatisfied with his lawyer; and, if he is indigent, he may be entitled to new court-appointed counsel -- provided he can show just cause for his dissatisfaction with his current counsel. See United States v. Barrow, No. 01-1457 (8th Cir. Apr. 26, 2002), 2002 WL 731182 at * *2 ("[a]ppointment of new counsel is warranted only when the defendant demonstrates justifiable dissatisfaction with his appointed attorney").[5] Criminal defendants cannot, however, use the right to counsel, or the right of self-representation, to manipulate the criminal justice system. "'[T]he right to counsel is a shield, not a sword. A defendant has no right to manipulate his right for the purpose of delaying and disrupting the trial.'" Meyer v. Sargent, 854 F.2d 1110, 1113 (8th Cir. 1988), quoting United States v. White, 529 F.2d 1390, 1393 (8th Cir. 1976). See also United States v. Yagow, 953 F.2d 427, 432 (8th Cir.) ("[w]hile the right to counsel is one of the most critical rights of the accused, it is not a tool to be manipulated at the defendant's whim or for his own purposes"), cert. denied, 506 U.S. 833 (1992).

[5] "Justifiable dissatisfaction includes an irreconcilable conflict or complete breakdown in communication... [b]ut it does not include a defendant's frustration with counsel who does not share defendant's tactical opinions but continues to provide zealous representation." Barrow, 2002 WL 731182 at *3 (citations omitted).

When a criminal defendant indicates that he wants a new lawyer, the trial court "must balance 'the [defendant's] right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.'" United States v. Swinney, 970 F.2d 494, 499 (8th Cir.), cert. denied, 506 U.S. 1011 (1992) and 507 U.S. 1007 (1993), quoting Wilson v. Mintzes, 761 F.2d 275, 280 (6th Cir. 1985). "[L]ast-minute requests to substitute counsel must not be allowed to become a tactic for delay." Swinney, 970 F.2d at 499.

In this case, Petitioner did not advise the trial court that he was unhappy with his legal counsel until just before the start of his trial. The jury panel was waiting, the witnesses were ready, and the attorneys and the judge were set to begin the trial. The timing of Petitioner's request for new counsel, and his inability to identify and substantiate any good cause for his alleged dissatisfaction with his current counsel, indicate that he was primarily interested in delaying and disrupting his trial.

Petitioner seems to believe that the trial judge offered him a "Hobson's choice" between going to trial with lawyers he did not want, or going to trial with no lawyer at all. He also seems to believe that after the trial court allowed him to discharge his original attorneys, he was faced with another Hobson's choice between representing himself or being represented by Attorney Gegen. In fact, however, it was not the trial court judge who forced those choices on Petitioner; it was Petitioner himself who made those choices necessary by waiting until the last minute to seek to fire his original lawyers and failing to show any just cause for doing so.

The trial judge tried to resolve the problem that Petitioner had created by helping him find a new lawyer who was willing to represent him -- namely Attorney Gegen. Petitioner was given the option of having Attorney Gegen provide full legal representation,

or having him merely act as standby counsel. Petitioner obviously chose to have Attorney Gegen actually represent him, rather than serve as standby counsel while he represented himself.

Petitioner now contends, however, that he never really had any choice in the matter, and that in fact he really wanted to represent himself. He therefore claims that the trial court deprived him of his constitutional right to self-representation. That claim must be rejected.

If a defendant wants to exercise his right to self-representation, he must do so "clearly and unequivocally." Id. at 835. See also United States v. Webster, 84 F.3d 1056, 1062 (8th Cir. 1996) ("[a] defendant who wishes to waive his right to counsel, and thereby to proceed pro se, must do so clearly and unequivocally"); Williams v. Bartlett, 44 F.3d 95, 100 (2d Cir. 1994) ("[t]he right to self-representation does not attach until it is asserted 'clearly and unequivocally'"). Indeed, courts must be very cautious about allowing a defendant to exercise his right to self-representation, so that the defendant does not later come back and claim that he was deprived of his Sixth Amendment right to be represented by counsel. See Hamilton v. Groose, 28 F.3d 859, 862-63 (8th Cir. 1994) ("[h]ad [the defendant] been found guilty after the trial judge allowed him to proceed pro se, [the defendant] undoubtedly would have sought to overturn his conviction by arguing that he was denied his Sixth Amendment right to counsel because his waiver of the right was equivocal and 'not very serious'"), cert. denied, 513 U.S. 1085 (1995). "A court must 'indulge in every reasonable presumption against [a defendant's] waiver' of his right to counsel." Id. at 862, quoting Brewer v. Williams, 430 U.S. 387, 404 (1977).

"The right to self-representation may be waived through conduct indicating that one is vacillating on the issue or has abandoned the decision to represent oneself altogether." Spencer v. Ault, 941 F.Supp. 832, 840 (N.D.Iowa 1996). In many cases, a defendant will say that he wants to discharge his attorney and represent himself when, in fact, what he really wants is a new attorney. See e.g., Webster, 84 F.3d at 1063 (defendant's "primary, if not exclusive, objective seems to have been the procurement of substitute counsel"); Hamilton, 28 F.3d at 862 ("[p]lainly what [the petitioner] wanted was yet another public defender, rather than to represent himself"). For this reason, a trial court must carefully consider whether the defendant is expressing a genuine, unequivocal desire to represent himself, or whether he is merely complaining about his present lawyer with the hope that he might get a new lawyer and/or a postponement of his trial.

In the instant case, the Minnesota Court of Appeals specifically determined that

> "[Petitioner] did not unequivocally waive his right to counsel.... In fact, [Petitioner] vacillated between asking to plead guilty and refusing to leave his jail cell until he received a new attorney. The court offered [Petitioner] the alternatives of proceeding to trial representing himself with standby counsel or having the court appoint an attorney to represent him. [Petitioner] refused to specify how he wanted to proceed, and the court chose the more conservative approach of appointing counsel."

Brooks, 2001 WL 436157 at *8.

The state court's determination that Petitioner did not unequivocally assert his right to self-representation is a finding of fact that is entitled to a presumption of correctness. Cain v. Peters, 972 F.2d 748, 749-50 (7th Cir. 1992), cert. denied, 507 U.S. 930 (1993). See also Hamilton, 28 F.3d at 861 (state court's determination that petitioner's request for self-representation was equivocal was a "factual finding"). Petitioner has not

offered any clear and convincing evidence to rebut the state court's factual determination on the issue, so this Court must accept it. 28 U.S.C. § 2254(d)(2).

Moreover, the record fully supports the state court's determination that Petitioner did not assert his right to self-representation clearly and unequivocally. Furthermore, once the trial court appointed Attorney Gegen to represent Petitioner, there was no further hint that Petitioner was dissatisfied with his attorney and wanted to represent himself. Petitioner certainly was not bashful about expressing his thoughts about the attorneys that he met. He had no trouble telling the trial court that he wanted to discharge his original defense attorneys, and he also made it clear that he did not want to be represented by Attorney Colich. As the Minnesota Court of Appeals said, "[Petitioner] had previously fired an attorney and rejected another attorney and clearly had the ability to reject this counsel [i.e. Gegen] as well." Id. Yet there is no indication whatsoever that Petitioner was dissatisfied with Attorney Gegen, or that he ever thought about representing himself after Gegen began to represent him. Gegen expressly asked Petitioner during the plea colloquy whether "you accept me fully as your attorney in this matter?" and Petitioner gave an unqualified affirmative answer. (Resp. Exh. B, p. 5.)

**B. Knowing and Voluntary Plea.**

Petitioner further claims that his guilty plea is invalid because it was not entered knowingly and voluntarily. See Parke v. Raley, 506 U.S. 20, 28 (1992) ("[i]t is beyond dispute that a guilty plea must be both knowing and voluntary").

The second half of this claim, i.e., that Petitioner's guilty plea was not voluntary, is not well-explained. Petitioner does not contend that he was exposed to any threats, coercion or improper pressure that affected the voluntariness of his plea. Instead, he appears to be contending that his plea was not voluntary because the appointment of

Attorney Gegen somehow left him with no choice but to plead guilty. He seems to be claiming (again) that the trial judge left him with a "Hobson's choice" – either plead guilty, or go to trial with an attorney that he did not want. This argument must be rejected for two reasons.

First, Petitioner has failed to demonstrate that he did not want to be represented by Attorney Gegen. To the contrary, Petitioner indicated by both his words and his actions that he accepted Attorney Gegen as his lawyer. There is nothing in the record to suggest that Petitioner was unwilling, or even reluctant, to have Gegen represent him. Thus, Petitioner cannot show that he was forced to plead guilty because he was "stuck" with a lawyer that he did not want.

In addition, the record consistently indicates that Petitioner truly wanted to plead guilty pursuant to a plea agreement that would allow him to avoid a trial and the possibility of life in prison. Before Attorney Gegen was appointed, Petitioner told the trial judge that he was looking for a plea bargain. He also repeatedly told Attorney Gegen that he wanted a plea bargain, and he indicated during the plea colloquy that he was satisfied with the plea bargain that had been negotiated. Therefore, Petitioner's present contention that he did not voluntarily accept his plea agreement is simply unsustainable.

We also conclude that Petitioner entered his plea "knowingly," i.e., he sufficiently understood the meaning and effect of his guilty plea. To enter a valid guilty plea, a criminal defendant must have "a full understanding of what the plea connotes and of its consequences." Boykin v. Alabama, 395 U.S. 238, 244 (1969). "[O]nly when it develops that the defendant was not fairly apprised of its consequences can his plea be challenged under the Due Process Clause." Mabry v. Johnson, 467 U.S. 504, 509 (1984).

Petitioner contends that his plea was not entered knowingly and intelligently because he allegedly did not realize (1) that at least one mental health expert considered him incompetent to stand trial, (2) that he could have asserted a mental illness defense, and that there may have been some evidence available to support that defense, (3) that he was pleading guilty to second degree murder rather than third degree murder, and (4) that the prison sentence stipulated in his plea agreement constituted an upward departure from the sentencing guidelines range. All of these arguments are unavailing.

First, Petitioner cannot be relieved of his guilty plea merely because he was (allegedly) unaware of the evidence suggesting that he was incompetent to stand trial. By the time Petitioner entered his guilty plea, the trial judge had already ruled that he was, in fact, competent to go to trial. Given that ruling, Petitioner's alleged unawareness of some evidence of incompetency has no discernible relevance to the validity of his guilty plea. Regardless of what Petitioner may have known or not known about that evidence, the trial judge had already decided he was competent when he entered his guilty plea, and at that point, Petitioner was on the verge of being tried (and quite possibly convicted) for first degree murder. That being the case, the Court can find no reason to believe that Petitioner would have rejected the plea bargain and elected to go to trial if he had known more about the evidence pertaining to his competency.

Petitioner also argues that he pleaded guilty without knowing that he had a potential mental illness defense. This argument must be rejected, because it is directly refuted by the record. At the plea colloquy, Attorney Gegen specifically asked Petitioner: "And we discussed several defenses in the case, <u>including a mental illness defense</u>; is that right?" Petitioner responded, "Yeah." (Exh. E, p. 8, [emphasis added].) Thus, it is simply not correct to say that Petitioner was unaware of a possible mental illness defense.

Petitioner further argues that his guilty plea is invalid because he did not know there was evidence that could have supported a mental illness defense. Even if the premise of that argument is true, (i.e., even if such evidence actually did exist and Petitioner was not aware of it), Petitioner's guilty plea would not necessarily be invalid. Petitioner has made no attempt to show that a mental illness defense could have actually succeeded if he had gone to trial. Nor has he made any attempt to show that he actually would have insisted on going to trial – and risked a first degree murder conviction and attendant life sentence – if he had known that there was (supposedly) some evidence that could have provided some support for a mental illness defense. Petitioner's guilty plea cannot be declared constitutionally invalid just because he claims to have been unaware of some allegedly exculpatory evidence; he must also show (at least) that he would not have pleaded guilty if had known about that evidence. Petitioner has made no such showing here. See Nguyen v. United States, 114 F.3d 699, 705 (8th Cir. 1997) (rejecting defendant's contention that his guilty plea was not entered knowingly and voluntarily when there "was no reason to believe" that allegedly unknown exculpatory evidence "would have led him to go to trial instead of pleading guilty").

At one point during the plea colloquy, Petitioner said "I thought it was Third Degree; not Second Degree." Attorney Gegen responded: "Well, Second Degree is what we talked about yesterday. Second Degree is where you will be sentenced to the 36 years and be out in 24 and get credit for the time served; do you understand that?" Petitioner then said, "All right[;] Okay." (Exh. E, p. 7.). The Court rejects Petitioner's contention that he did not know he was pleading guilty to second degree murder. Although Petitioner initially claimed some confusion about the specific charge to which he was pleading guilty, that issue was quickly resolved, and the record clearly shows that Petitioner knew he was

pleading guilty to second degree murder.

Finally, Petitioner claims that his guilty plea is invalid because he entered it without a full understanding of the sentencing guidelines range for second degree murder. This argument might warrant greater concern and consideration if the length of Petitioner's sentence had not been definitively established by the terms of his plea agreement. If Petitioner had pleaded guilty without having any notion of the potential sentence that he might receive, then it could perhaps be argued that his plea was invalid because he did not have a sufficient understanding of its consequences. However, that obviously did not happen in this case.

Petitioner knew, very specifically, the sentence he would receive as a consequence of his guilty plea. He pleaded guilty with full knowledge of the exact sentence that he should expect to receive, (i.e., 36 years), and he got exactly the sentence that he had been promised. Petitioner has not shown that the state courts' ratification of his guilty plea, despite his alleged unawareness of the sentencing guideline range for second degree murder, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). He is therefore not entitled to have his conviction vacated by writ of habeas corpus just because he did not know the sentencing guidelines range.

C. <u>**Ineffective Assistance of Counsel**</u>

Petitioner finally argues that his guilty plea should be vacated because he received ineffective legal assistance from Attorney Gegen. He claims that Gegen was unable to provide any meaningful legal assistance because he did not have a sufficient understanding of the case. In particular, Petitioner contends that Attorney Gegen did not

understand either the potential mental illness defense that Petitioner might have been able to present, or the sentencing guidelines range for second degree murder. Petitioner also contends that Attorney Gegen did not spend enough time explaining the details of the written plea agreement that he signed.

Before considering the merits of Petitioner's ineffective assistance claim, it bears repeating that he is not entitled to de novo review of this claim in his present federal habeas corpus action. As discussed above, (see pp. 9-11, supra), AEDPA "'mandates a deferential review of state court decisions.'" Boyd v. Minnesota, 274 F.3d 497, 500 (8th Cir. 2001), quoting James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999), cert. denied, 528 U.S. 1143 (2000). It does not matter whether the federal court agrees or disagrees with the state court's analysis; a writ of habeas corpus can be granted only if the state court's resolution of the petitioner's claim "cannot reasonably be justified under existing Supreme Court precedent." Boyd, 274 F.3d at 500 (citations omitted).

In Petitioner's case, the Minnesota Court of Appeals correctly recognized that "[t]o establish a claim of ineffective assistance of counsel, the defendant must affirmatively show two elements: (1) his counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." Brooks, 2001 WL 436157 at *9, citing Strickland v. Washington, 466 U.S. 668, 687-88 (1984).

The Court of Appeals did not discuss the first prong of the Strickland standard, (i.e., whether counsel's representation fell below an objective standard of reasonableness), but instead went directly to the second prong, and considered whether Petitioner was prejudiced by Attorney's Gegen's legal representation. See Strickland, 466 U.S. at 697 ("[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack

of sufficient prejudice, which we expect will often be so, that course should be followed"); see also Siers v. Weber, 259 F.3d 969, 975 (8th Cir. 2001) ("[w]e need not inquire into the effectiveness of counsel, however, if we determine that no prejudice resulted from counsel's alleged deficiencies"), cert. denied, 122 S.Ct. 1087 (2002). After examining the trial court record, the State Court of Appeals determined that Petitioner could not satisfy the prejudice requirement, and thus he could not sustain his ineffective assistance of counsel claim.

Petitioner has argued, both in his state court appeals and again here, that he should not have to satisfy Strickland's prejudice requirement because the errors committed by his attorney were so egregious that, for all practical purposes, he really had no legal representation at all. This argument is grounded on a Supreme Court decision that says prejudice should be presumed when an attorney's legal representation "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." United States v. Cronic, 466 U.S. 648, 659 (1984). Although Cronic does indeed create an exception to the Strickland prejudice requirement, the federal "courts of appeals have interpreted this exception... very narrowly and rarely have found a situation that justifies application of the presumption of prejudice." Fink v. Lockhart, 823 F.2d 204, 206 (8th Cir. 1987).

The Minnesota Court of Appeals cited Cronic in its opinion in Petitioner's case, and acknowledged that "[w]hen there is a total absence of representation, no specific showing of prejudice... is required." Brooks, 2001 WL 436157 at *9. The State Court determined, however, that Cronic's presumption of prejudice rule could not properly be applied in Petitioner's case, because his "counsel's actions, even if minimal, amount[ed] to more than a total absence of meaningful adversarial testing." Id. This led the State Court to further determine that Petitioner's ineffective assistance claim would have to be

denied, unless he could show prejudice -- i.e. that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty." Id.

The State Court's citations to Strickland and Cronic show that the proper legal standards were applied to Petitioner's ineffective assistance of counsel claim. See Williams, 529 U.S. at 406 (when a state court applies a Strickland analysis to an ineffective assistance claim, the court has acted in accordance with -- not contrary to -- established federal law); see also id. at 417 (Rehnquist, C.J., concurring in part and dissenting in part) ("[g]enerally, in an ineffective-assistance-of-counsel case where the state court applies Strickland, federal habeas courts can proceed directly to 'unreasonable application' review"). Thus, the only issue to be resolved here is whether Petitioner has demonstrated that the Minnesota Court of Appeals' ruling on his ineffective assistance claim involves an "unreasonable application of clearly established Federal law" to the facts of his case. 28 U.S.C. § 2254(d)(1).

This Court cannot conclude that the Minnesota Court of Appeals' application of Strickland and Cronic was objectively unreasonable. It cannot be said that Attorney Gegen failed to give Petitioner meaningful misrepresentation. Gegen developed a viable attorney-client relationship with Petitioner; he reviewed Petitioner's file and conferred with Petitioner's previous attorneys; he met with Petitioner on at least five different occasions during the week before the guilty plea was entered; he was sensitive to Petitioner's concerns and objectives; and -- most significantly -- he was able to negotiate and consummate a plea arrangement that satisfied Petitioner and spared him from a first degree murder conviction and a sentence of life in prison. In light of these legal services rendered by Attorney Gegen, it was not "objectively unreasonable" for the Minnesota Court of Appeals to conclude that his actions provided "more than a total absence of meaningful

adversarial testing," (Brooks, 2001 WL 436157 at *9), and that Petitioner therefore was not entitled to a Cronic presumption of prejudice.

Having determined that there should be no presumption of prejudice, the State Court of Appeals next considered whether Petitioner had shown that he suffered any actual prejudice as a result of the alleged shortcomings in Attorney Gegen's legal representation. On that issue, Petitioner failed to convince the State Court of Appeals that he would have rejected the plea agreement and gone to trial if his attorney had somehow provided more competent legal representation. The State Court determined that

> "[Petitioner] has not shown how additional time spent with [Attorney Gegen] would have influenced his decision to accept the plea agreement. [Petitioner] presented no evidence that he would have gone to trial and utilized the mental-illness defense. [Footnote omitted.] [Petitioner] wanted to plead guilty from the first day of trial."

Id. Thus, the Court of Appeals concluded that Petitioner "has not shown he was prejudiced by counsel's determination that a mental-illness defense would not be effective at trial, his failure to investigate the mental-illness defense further, or by the amount of time [Petitioner] spent with counsel." Id.

Once again, whether this Court agrees with the State Court's conclusion is immaterial. The only issue to be decided on federal habeas review is whether the state court's application of Strickland to the facts of this case was "objectively unreasonable." Williams, 529 U.S. at 409. Here, as in Siers v. Weber, supra, the state court's "conclusion that there was no prejudice" resulting from the attorney's alleged errors is "sufficiently reasonable to be entitled to deference under AEDPA." 259 F.3d at 975. It was not objectively unreasonable for the State Court of Appeals to conclude that Petitioner had failed to show that he suffered any actual prejudice as a result of the perceived

shortcomings in Attorney Gegen's legal representation.

Although a federal habeas court need not fully agree with the state court's decision, (as long as the decision is not "objectively unreasonable"), it should be noted that in this case the Court does fully agree with the Minnesota Court of Appeals' resolution of Petitioner's ineffective assistance claim. This Court finds no reason to believe that Petitioner would have rejected the plea bargain that was offered to him, and would have elected to go to trial, even if Attorney Gegen had done everything that Petitioner now claims he should have done. Indeed, if Petitioner had rejected the plea agreement and gone to trial, it is not unlikely that he would have been convicted of first degree murder, and that he would now be claiming Attorney Gegen provided ineffective assistance of counsel by failing to convince him to accept the plea agreement.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that Petitioner's Application for a Writ of Habeas Corpus, (Docket No. 1), be DISMISSED WITH PREJUDICE.

Dated: May 22, 2002

JOHN M. MASON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before June 7, 2002, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.